**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 3 0 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN FOX

                Petitioner,

    -against-

DANIEL MARTUSCELLO, JR., Superintendent,
Coxsackie Correctional Facility

                Respondent.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
16-CV-5416 (CBA)

**AMON, United States District Judge:**

    John Fox petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He seeks to vacate his New York state conviction, following a jury trial, for manslaughter in the second degree as a hate crime, attempted robbery in the first degree as a hate crime, and attempted robbery in the second degree as a hate crime, on the following eight grounds: (1) denial of his constitutional right to be present; (2) denial of his constitutional right to a trial by jury; (3) denial of his constitutional right to present evidence; (4) denial of his constitutional right to the effective assistance of counsel; (5) his statements to the police were the product of a custodial interrogation in the absence of probable cause; (6) the prosecution did not establish beyond a reasonable doubt the voluntariness of his statements; (7) the evidence did not establish beyond a reasonable doubt that he committed a "hate crime" as defined by New York law; and (8) the cumulative effect of constitutional error denied him a fair trial. (See D.E. # 1 ("Pet.") at 6–15.)  For the reasons set forth below, Fox's petition is denied.

## FACTUAL BACKGROUND

### I.    Pre-Indictment

    The events leading up to the commission of Fox's crimes are, for the most part, not in dispute.  In the early evening of October 8, 2006, Fox and his friends Anthony Fortunato and Gary

Timmins were in the living room of Fortunato's home discussing how they could obtain marijuana. (D.E. # 8 ("Resp. Aff.")[1] ¶ 46; D.E. # 10 ("Pet'r Reply") at 2.) Fortunato proposed that they attempt to meet a gay man. (Id.) He explained that in the past, he had used a scheme by which he would arrange to meet a gay man in a hotel room and, while the man was in the bathroom, he would take his clothes and money. (Id.) At Fortunato's request, Fox entered his screen name on Fortunato's computer, and Fortunato went to a gay chat room. (Resp. Aff. ¶ 47; Pet'r Reply at 2.) There, Fortunato—using Fox's screen name—began communicating with a man named Michael Sandy. (Resp. Aff. ¶ 47.) Sandy and Fortunato (posing as Fox) discussed having sexual relations and pooling their money to buy marijuana, and they arranged to meet. (Id.) While Fortunato communicated with Sandy using Fox's screen name, Fox drank beer on the couch. (Id.) Fox, Fortunato, and Timmins then left Fortunato's home and walked to Coyle Street in Brooklyn. (Id. ¶ 48.) Ilya Shurov—an acquaintance of Timmins—joined them. (Id.) Sandy was in his car on Coyle Street, and Fox and Fortunato went over to speak to him, but Sandy became nervous and left. (Id.)

Fortunato, Fox, Timmins, and Shurov then returned to Fortunato's home. (Id. ¶¶ 48–49; Pet'r Reply at 2.) Fortunato—again using Fox's screen name and posing as Fox—had another instant message conversation with Sandy during which Sandy agreed to meet with Fox. (Resp. Aff. ¶¶ 49-50; Pet'r Reply at 2.) Fortunato, Fox, Timmins, and Shurov discussed how to proceed. (Resp. Aff. ¶ 51; Pet'r Reply at 2–3.) They planned that Fox would meet Sandy and drive with him to Plumb Beach in Brooklyn. (Resp. Aff. ¶¶ 50–51; Pet'r Reply at 2–3.) They planned to take marijuana or money from Sandy, but they agreed that there would be no violence. (Id. at ¶

[1] D.E. # 8 includes both the Respondent's affidavit in opposition to Fox's habeas petition and the Respondent's memorandum of law in opposition to Fox's habeas petition. References to the affidavit are cited as "Resp. Aff." and references to the memorandum of law are cited as "Resp. Opp'n."

52; Pet'r Reply at 2–3.) While they were at Fortunato's home, Fox drank more beers, "[m]aybe two or three." (Resp. Aff. ¶ 51.)

Pursuant to the plan, Fox went to meet Sandy at Coyle Street. (Resp. Aff. ¶ 54; Pet'r Reply at 2–3.) Fortunato, Shurov, and Timmins waited at the beach until Fox and Sandy arrived. (Resp. Aff. ¶¶ 55–56; Pet'r Reply at 2–3.) At that point, Shurov ran over to Sandy and punched him, which had not been part of the plan. (Resp. Aff. ¶ 56 & n.16; Pet'r Reply at 2–3.) Sandy ran away, toward the Belt Parkway, with Shurov and Fox in pursuit. (Resp. Aff. ¶ 56; Pet'r Reply at 3.) There is conflicting evidence about what Fox did once he was at the Belt Parkway, but it is undisputed that he was there and that Sandy was struck by a car on the Parkway. (Resp. Aff. ¶¶ 56, 58-59; Pet'r Reply at 3.) Sandy later died in the hospital. (Resp. Aff. ¶ 81; Pet'r Reply at 3.)

On October 10, 2006, at about 2:00 a.m., four detectives—Detectives Byrne, Cennamo, Habert, and Hopkins—arrived at SUNY Maritime, where Fox was a student, to speak to him. (Resp. Aff. ¶¶ 8–10.) At least six officers from the Hate Crimes Task Force, including Detective D'Angelo, were already on campus when the detectives arrived. (Resp. Aff. ¶ 10.) Pursuant to a plan arranged with police, a security guard at SUNY Maritime knocked on the door of Fox's room and claimed, falsely, that there was a report of a smoke alarm going off. (Id.)

The parties dispute much of what happened thereafter. As relevant for purposes of this Memorandum and Order, according to Respondent, the security officer entered Fox's room and asked him what his name was, to which Fox answered truthfully. (Id. ¶ 10.) Detective Byrne introduced himself, stating that he worked for "Brooklyn South Homicide," and asked if he could "come in and speak to" Fox. (Id. ¶ 11.) Fox agreed, and Detectives Byrne and Cennamo then entered the room. (Id.) Detective Byrne asked Fox if he would mind accompanying them to the 61st Precinct in Sheepshead Bay to speak with them further, and Fox agreed. (Id.) Fox left his

dormitory room with the detectives and proceeded to the parking lot, where there were several officers from the Hate Crimes Task Force present. (Id. ¶ 12.) Fox got into a car with Detectives Byrne, Cennamo, D'Angelo, and Hopkins—two sat in the backseat with him—and was driven to the precinct. (Id.) No one questioned Fox about the incident during the drive. (Id.) Fox was then brought to an interview room, where he was momentarily left by himself, with the door to the room open. (Id. ¶ 13.) Detectives Byrne, Cennamo, and D'Angelo entered the room, sat on the opposite side of a table as Fox, and began interviewing him. (Id. ¶ 13.) He was not initially advised of his Miranda rights. (Id.) After an initial period of questioning, Fox made a statement about the events surrounding Sandy's death, which Detective Byrne pointed out contradicted an earlier statement he had made, and Fox became "extremely nervous." (Id. ¶¶ 13–15.) At that point, Detective Byrne stopped the interview and advised Fox of his Miranda rights. (Id. ¶ 15.) After being advised of his rights, Fox agreed to continue speaking to detectives. (Id.) He made multiple statements to the detectives and to Assistant District Attorney Anna-Sigga Nicolazzi about his involvement in the events surrounding Sandy's death, including one videotaped statement. (Id. ¶¶ 18–23.) According to Fox's version of events, he was not read Miranda warnings and the detectives were "intimidating and yelling at him for a long period of time" before he made any incriminating statements. (Pet. at 14.)

Fox was thereafter indicted in Kings County, New York, for, among other crimes, one count each of second-degree murder as a hate crime (N.Y. Penal Law §§ 125.25(3), 485.05(1)(a)), second-degree murder (N.Y. Penal Law § 125.25(3)), second-degree manslaughter as a hate crime (N.Y. Penal Law §§ 125.15(1), 485.05(1)(a)), second-degree manslaughter (N.Y. Penal Law § 125.15(1)), attempted robbery in the first and second degrees as hate crimes (N.Y. Penal Law §§

4

110.00/160.15(1), 110.00/160.10(1), 485.05(1)(a)), and attempted robbery in the first and second degrees (N.Y. Penal Law §§ 110.00/160.15(1), 110.00/160.10(1)). (Id. at ¶ 5.)

## II. Pre-Trial Proceedings

Before trial, Fox and his co-defendants Shurov and Fortunato moved to dismiss the counts in the indictment alleging a hate crime, in part on the ground that there was no grand jury evidence of hatred, bias, or prejudice against the victim.[2] (D.E. # 13 ("Resp. Supp. Aff.") at ¶ 2.)[3] On August 2, 2007, the Supreme Court of the State of New York denied the motion in a written opinion. People v. Fox, 844 N.Y.S.2d 627 (Sup. Ct. 2007).

Fox also moved to suppress his statements to law enforcement; the hearing court denied his motion. (D.E. # 8-2 at 271, 300.)[4] Fox's statement to law enforcement implicated co-defendant Fortunato and, if placed in evidence before the jury trying Fortunato, would violate his Sixth Amendment right of confrontation under Bruton v. United States, 391 U.S. 123 (1968). Fortunato moved to sever his case from Fox's, (Resp. Aff. ¶ 84), but rather than sever the cases to address the Bruton problem, the court instead directed that two juries be selected—one for Fortunato and one for Fox—and Fortunato's jury could be removed from the courtroom when evidence of Fox's statements to law enforcement was presented by the prosecutor. (Resp. Aff. ¶¶ 84–87.)

## III. The Trial

At the criminal trial, two juries were selected, one for Fortunato and one for Fox. (See, e.g., Tr. 59-60 (trial court's explanation to Fox's jury, before trial, about how the dual-jury system

---

[2] Shurov pleaded guilty to attempted first-degree robbery as a hate crime and second-degree manslaughter as a hate crime. Timmins pleaded guilty to attempted second-degree robbery as a hate crime. (Resp. Aff. ¶ 5 n.1.)
[3] D.E. # 13 includes both the Respondent's supplemental affidavit in opposition to Fox's habeas petition and the Respondent's supplemental memorandum of law in opposition to Fox's habeas petition. References to the affidavit are cited as "Resp. Supp. Aff." and references to the memorandum of law are cited as "Resp. Supp. Opp'n."
[4] Pagination is based on the PDF page number, not the page number of each individual exhibit within the docket entry.

would operate during the trial).)[5] As had been previously decided, Fortunato's jury was not present when Fox's statements to law enforcement were presented by the prosecutor, so as to protect Fortunato's Sixth Amendment confrontation rights as articulated in Bruton. (See id. at 845-931.)

In addition to using the dual-jury structure to deal with the Bruton problem with respect to Fox's statements, the trial court organized the trial such that other evidence that was relevant or admissible against one defendant but not the other was presented only in front of the defendant's jury against whom it was admissible, to avoid resort to limiting instructions. (See, e.g., id. at 60 (explaining to Fox's jury before the trial that "[w]hen of course there is evidence that relates to only one defendant, only one jury will be here"; id. at 369–80 (portion of the State's case during which Fortunato's jury, but not Fox's jury, was present); id. at 453–56 (discussion among counsel and the trial court about dismissing Fox's jury during the presentation of evidence that was solely admissible against Fortunato).) The court did so by dismissing at various points one defendant's jury or the other's, and by allowing leading questions to be used when both juries were present, if there was a risk that a witness would respond in a way that was inadmissible against one of the defendants. (See, e.g., id. at 456: "We are going to do cross examination of each of the lawyers. Then take out the appropriate jury. I will allow some leeway in terms of leading on [the prosecutor's] part to get to precise questions that are only in front of Mr. Fortunato's jury.") When evidence presented by the State was common to and admissible against both defendants, both juries remained present. (See, e.g., id. (referring to certain parts of the State's case that would be tried in front of both juries, the trial court stated: "This is the way I want to do it . . . because most of this information is in common . . ."); see also id. at 60 (instructing the jury that "much of the

---

[5] The transcript of Fox's criminal trial was submitted as the State's Habeas Ex. F, as D.E. # 8-3 through 8-8. References to the trial transcript are cited as "Tr.," with pages based on the page number of the trial transcript.

evidence . . . will be common to both of the defendants, and in that instance as you know . . . both sets of jurors will be here").)

Before the State rested its case, Fox's lawyer asked the trial court what would "happen[] with [Fox's] jury" in the event that Fortunato put on a defense and Fox did not. (Id. at 443–44.) The court answered that "obviously they aren't going to summations in this case unless and until both defendants rest. If it's going to be protract[ed] we are going to send your jury home. I don't know if that will be the case." (Id. at 444.) Fox did not object to the court's proposed plan to send his jury home during the pendency of Fortunato's anticipated defense case. (Id.)

Later on—still during the State's presentation of its case, and before Fortunato presented his defense case—the trial court explained that there were "some things that [the court] allowed in with respect to one defendant and not . . . with respect to the other and vice versa," but stated that "[i]f for some reason strategically you decide that your jury wants to hear that information, let me know that ahead of time." (Id. at 717.)

The State's case against Fox at trial included the following: (1) Fox's videotaped statements to law enforcement; (2) testimony by Timmins about Fox's involvement in the encounter with Sandy; (3) testimony by a witness, Vaillant, who had been driving on the Belt Parkway on the night in question and testified that she observed Fox attacking Sandy on the Belt Parkway in front of her car; (4) Vaillant's identification of Fox in a lineup, as one of Sandy's assailants; (5) the recordings of two 911 calls, one from Vaillant and one from an unidentified woman, stating that three "kids" had been fighting on the Belt Parkway; (6) Fox's friend's testimony regarding admissions Fox made to him about the crimes against Sandy; (7) evidence that the messages that lured Sandy to Fortunato's neighborhood were sent under Fox's screen name; and (8) evidence of photographs of Fox being found on Sandy's computer.

After the State rested (id. at 1383), Fox's counsel requested a "trial order of dismissal for failure to make out the prima facie case, in particular in regard to the robbery theory and the hate crimes," (id. at 1385-36). The trial court denied the motion. (Id. at 1386.) At that point, the trial court conferred with counsel, and the following discussion was had:

> THE COURT: Mr. Patten [Fox's counsel], step up, please.
> [Prosecutor]: I 'm thinking in terms of scheduling. You have Mr. Fox's jury here. Are we going to get to them today?
> THE COURT: Do you have witnesses here now?
> [Fortunato's counsel]: I have them within ten minutes, Judge.
> [Prosecutor]: And you don't know about your client?
> PATTEN: The only defense I put in is my client. I'm not calling any people.
> [Prosecutor]: Shall we have his jury come back after lunch?
> THE COURT: I think we should have his jury come back later if his client doesn't testify and your client wants to, we will do it. We are going to send that jury out.
> PATTEN: That decision will be made over the lunch hour.
> THE COURT: Bring your jury in, and we will let them go.

(Id. at 1399–1400.) Fox rested without testifying or presenting any witnesses on his behalf. (Id. at 1460.) At that point, the trial court dismissed his jury, instructing them to take the rest of the afternoon and the following day off, and to return to the court thereafter for summations. (Id. at 1460–61). Fox and his counsel did not object to their dismissal. (Id.) Fox's counsel then asked: "Judge, he [referring to Fox] will not be produced tomorrow?" to which the trial court responded "[t]hat's right." (Id. at 1461). Fox and his counsel did not object. (Id.) Fox left the courtroom, and Fortunato entered. (Id. at 1461–62.) Fortunato then testified and presented several witnesses in front of his jury. Fox, his jury, and his attorney were not present during this time.

After summations, and upon Fox's counsel's application, the trial court agreed to charge intoxication to the jury, as relevant to negate Fox's intent. During its charge on felony murder as a hate crime, the trial court provided instructions on "attempt to commit a crime," (id. at 1904–06), which included a discussion of intent (id. at 1904–05), and instructed the jury that "evidence of the defendant's intoxication may be considered whenever it is relevant to negate an element of

8

a crime charged." (Id. at 1906). The court continued: "Thus, in determining whether the defendant had the intent necessary to commit a crime, you may consider whether the defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the intent necessary for commission of that crime." (Id.) The court then charged the jury on felony murder, including repeating its instructions regarding intoxication. (Id. at 1914–17.) Next, the court charged the jury on second-degree manslaughter as a hate crime, first-degree robbery as a hate crime, and attempted second-degree robbery as a hate crime, without repeating its instructions regarding intoxication. (Id. at 1925–41.) Fox's counsel did not object to the Court's failure to explicitly charge intoxication with respect to the latter counts. (Id.)

The jury acquitted Fox of murder in the second degree and murder in the second degree as a hate crime. (Id. at 2208–10.) The jury convicted Fox of manslaughter in the second degree as a hate crime, attempted robbery in the first degree as a hate crime, and attempted robbery in the second degree as a hate crime. (Id.) Fortunato was convicted of second-degree manslaughter as a hate crime and attempted petit larceny.

## IV.    Post-Conviction Proceedings

Fox filed a post-conviction motion pursuant to Article 440 of New York's Criminal Procedure Law to vacate the judgment of conviction. (Pet'r Reply at 4.) The motion was denied by the trial judge in a written opinion. (Id.) Fox's motion for leave to appeal the denial and consolidate it with his direct appeal of the conviction was denied by a Justice of the Appellate Division. (Id.)

On direct appeal, the Appellate Division, Second Department, affirmed the judgment of conviction. People v. Fox, 998 N.Y.S.2d 440 (2014). An application for leave to appeal to the New York Court of Appeals was denied. People v. Fox, 23 N.Y.S.3d 644 (2015) (Table). Fox

filed a petition with this Court in September of 2016 while he was incarcerated. (Pet'r Reply at 5.) He was released on parole in November 2017. (Id.)

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a state prisoner may petition for "a writ of habeas corpus . . . only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the petitioner seeks review of a claim "adjudicated on the merits in State court proceedings," AEDPA "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus," Johnson v. Williams, 568 U.S. 289, 298 (2013), and "imposes a highly deferential" standard of review, Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (citing Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam)); see also 28 U.S.C. § 2254(d). A state court is presumed to have adjudicated a federal claim on the merits when the claim "has been presented to a state court and the state court has denied relief . . . in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011).

A district court applying AEDPA deference may grant an application for a writ of habeas corpus only where the state proceedings resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); see also Williams v. Taylor, 529 U.S. 362, 405–06 (2000); Evans v. Fischer, 712 F.3d 125, 132–33 (2d Cir. 2013).

"'[C]learly established Federal law' refers to holdings, and not dicta, of cases decided by the Supreme Court, as opposed to lower federal courts." Fischer, 712 F.3d at 133 (citing Williams,

529 U.S. at 412). A state court's ruling on the merits is "contrary to" a clearly established Supreme Court holding if it "arrives at a conclusion opposite to that reached by th[e] Court on a question of law or . . . decides a case differently than th[e] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13. An "unreasonable application" of clearly established Supreme Court precedent occurs when "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "An application of law is 'unreasonable' only if it involves '[s]ome increment of incorrectness beyond error.'" Fischer, 712 F.3d at 133 (alteration in original) (quoting Overton v. Newton, 295 F.3d 270, 277 (2d Cir. 2002)); see also Harrington v. Richter, 562 U.S. 86, 101 (2011) (holding that if "'fairminded jurists could disagree' on the correctness of the state court's decision," that decision is not unreasonable (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004))); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (noting that whether a state court's determination was unreasonable is "a substantially higher threshold" than whether that determination was incorrect).

## DISCUSSION

### I.     Ground One: Right to Be Present

Fox reasserts the argument concerning his constitutional right to be present that he unsuccessfully raised before the Appellate Division, Second Department. (Pet'r Reply at 15–21.) Specifically, Fox contends that his exclusion from the courtroom during the testimony of his co-defendant, Fortunato, violated his constitutional right to be present at a material stage of his trial. Fox argues that a criminal defendant has the right to be present at all stages of a criminal trial at which his presence "has a relation, reasonably substantial, to the fulness of his opportunity to defend himself against the charge," id. at 18 (quoting Kentucky v. Stincer, 482 U.S. at 745), and

that Fortunato's testimony constituted such a stage because Fortunato testified to information "that would be helpful to [Fox] in defending himself—information that affirmatively reduced his culpability or which contravened . . . the prosecutor's case against him," id. at 19. More specifically, "Fortunato would have confirmed" Fox's "drinking [on] the night of the offense," "the plan to engage in a larceny by trick," and "Shurov's sudden and unexpected turn to violence." Id. at 20–21. If Fox had heard this testimony, he argues, he would have realized that Fortunato's testimony was favorable to him, and he would have called Fortunato to be a witness in his own case, in the presence of his jury. Id. at 19.

The Appellate Division concluded that Fortunato's testimony "was not a critical stage of [Fox's] trial," and that Fox's absence from that portion of the trial therefore did not violate his right to be present. Fox, 998 N.Y.S.2d at 441 (internal quotation marks omitted) (quoting People v. Morris, 590 N.Y.S.2d 104, 105 (1992)). Because the Appellate Division's determination was neither contrary to, nor an unreasonable application of, the Supreme Court's standard for the constitutional right to be present, this Court now holds that Fox is not entitled to habeas relief on this ground.

The Supreme Court has held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Stincer, 482 U.S. at 745. The constitutional right to presence is "rooted to a large extent in the Confrontation Clause of the Sixth Amendment," and thus clearly encompasses situations in which a criminal defendant is confronting witnesses or evidence against him. United States v. Gagnon, 470 U.S. 522, 526 (1985). The Supreme Court has held that it also extends to "some situations where the defendant is not actually confronting witnesses or evidence against him," so long as his presence "has a relation, reasonably substantial, to the fulness of his

opportunity to defend against the charge." Snyder v. Commonwealth of Massachusetts, 291 U.S.

97, 107–08 (1934), overruled in part on other grounds by Malloy v. Hogan, 378 U.S. 1 (1964); see

also Faretta v. California, 422 U.S. 806, 819 n.15 (1975) ("[A defendant has] a right to be present

at all stages of the trial where his absence might frustrate the fairness of the proceedings."); Cohen

v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) (same).

Although Fox is correct that a criminal defendant has a constitutional right to be present at

all critical stages of his trial, he errs in his assertion that the testimony of a co-defendant, outside

the presence of the defendant's jury, constitutes such a stage. He cites no Supreme Court case

holding that a criminal defendant has a right to hear any and all testimony that might be "helpful"

to him in defending himself when that testimony occurs in a portion of the trial relating only to a

co-defendant.[6]

Here, Fortunato's testimony was not in front of, nor was it submitted to, Fox's jury. It

formed no part of the State's case against him nor his jury's verdict. The fact that, if he had been

present, Fox may have heard Fortunato's testimony, believed it was favorable to him, and then

called Fortunato as a witness does not render it a "critical stage" of his trial.[7] The state courts'

determination that Fox did not have a constitutionally protected right to be present during this part

of the proceedings was not "contrary to, nor an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Nor was it "based on an unreasonable determination of the facts in light of the evidence presented

---

[6] Indeed, as Fox points out in his reply brief, the Supreme Court has not addressed dual jury trials whatsoever. Id. at 21; see also Hedlund v. Ryan, 854 F.3d 557, 571 (9th Cir. 2017) ("The Supreme Court has not spoken on the issue of dual juries.").

[7] At most, Fox's arguments regarding the importance of Fortunato's testimony and the alleged benefits of having his jury hear it are a criticism of his defense counsel, who failed to arrange to have Fortunato's testimony presented to Fox's jury. Such arguments, however, sound in ineffective assistance of counsel, not denial of the right to be present, and are therefore discussed in response to the eponymous habeas ground, infra.

in the State court proceeding." 28 U.S.C. § 2254(d)(2). Accordingly, Fox is not entitled to habeas relief on this ground.

## II.    Ground Two: Right to Trial by Jury

Fox also reasserts the argument concerning his constitutional right to a jury that he unsuccessfully raised before the Appellate Division. Specifically, Fox contends that the absence of his jury during Fortunato's testimony violated his right to a jury trial. Fox argues that before dismissing Fortunato's jury from the courtroom for the pendency of Fortunato's testimony, the trial court was required to secure a knowing, voluntary, and intelligent waiver of Fox's right to a trial by jury. (Pet'r Reply at 21.) This claim fails.

Fox's and Fortunato's trials were conducted by means of a dual-jury procedure, in part because Fox's statements included references to Fortunato that could not be redacted. See generally Bruton, 391 U.S. at 123 (1968). Fox's jury was present during the presentation of all of the State's evidence against him, and Fox did not present any evidence in his own defense. He failed repeatedly to object to the trial court's proposals to dismiss his jury during Fortunato's testimony, and he did not object when his jury was thereafter dismissed. Fox also failed to accept the trial court's invitation to let the court know if he "strategically . . . decide[d]" that he wanted his jury to hear evidence that it would otherwise be dismissed during. (Tr. 717.) Fox has offered no state or federal precedent to support his assertion that the trial court was required to secure his knowing, voluntary, and intelligent waiver prior to dismissing his jury for this portion of the trial.[8] To the contrary, New York state courts have warned about the reverse—viz., that a trial court risks infringing on a criminal defendant's constitutional rights when it denies a defendant's request for his jury to be excused during the testimony of his co-defendant. See People v. Warren, 925

---

[8] Again, as Fox points out in his reply brief, the Supreme Court has not addressed dual jury trials whatsoever. (Pet'r Reply at 21.) See also Hedlund, 854 F.3d at 571.

14

N.Y.S.2d 797, 798–99 (2011) (holding that the trial court deprived defendant of a fair trial when it denied defendant's requests that the jury be excused during the testimony of his co-defendant), aff'd, 984 N.E.2d 914 (2013).

The sole case Fox cites in support of his position is People v. Ricardo B., 73 N.Y.2d 228 (1989). But Ricardo B. does not hold that a trial court must secure a "knowing, voluntary, and intelligent waiver of [a defendant's] right to trial by jury" in this circumstance. (Pet'r Reply at 21 (citing U.S. v. Carmente, 544 F.3d 105, 107–08 (2d Cir. 2008)).). Rather, in that case, each co-defendant in a dual-jury trial was given the "option of withdrawing his jury during [the] presentation of the other's defense," and neither did so. Ricardo B., 73 N.Y.2d at 232. The Court of Appeals held that the trial court's use of the dual-jury procedure in that case did not prejudice the defense and did not violate the defendant's right to a trial by jury.

To the extent that Ricardo B. can be read, as Fox asserts, as the Court of Appeals' "approval of the practice of asking a defendant in a dual-jury case" whether he wishes his jury to remain in the courtroom during his co-defendant's testimony, (Pet'r Reply at 17), violation of a practice "approved of" by a New York state court falls far short of the violation of "clearly established Federal law, as determined by the Supreme Court" that is necessary to warrant habeas relief, Fischer, 712 F.3d at 133 (citing Williams, 529 U.S. at 412). In sum, Fox is not entitled to habeas relief on this ground.

### III.    Ground Three: Right to Present Evidence

Similar to the first two grounds, Fox's third alleged ground for relief is that he was deprived of his constitutional right to present evidence because he and his jury were absent during Fortunato's testimony. Fox's claim, however, is procedurally defaulted and in any event lacks merit.

## A. Procedural Bar

On direct appeal, the Appellate Division denied Fox's right-to-present-evidence claim as unpreserved for appellate review, Fox, 998 N.Y.S.2d at 440. The Appellate Division does not explicitly note in its opinion the basis on which it held this claim unpreserved, but a review of the record makes clear that it is because Fox failed to comply with New York's contemporaneous objection rule, which requires that a party "protest" the asserted error before the trial court "at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2). This basis for rejecting Fox's claim is "a state law ground that is independent of the federal question and adequate to support the judgment" and which federal courts have no jurisdiction to review. Coleman v. Thompson, 501 U.S. 722, 729 (1991); see also, e.g., Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment" rests on independent and adequate state law grounds). This is true whether the state law ground is substantive or procedural and regardless of whether the state law ground was the state court's sole rationale or an alternative holding. Coleman, 501 U.S. at 729; Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Green, 414 F.3d at 294.

New York's contemporaneous objection rule is certainly a ground that is "independent" of the federal question concerning a criminal defendant's right to present evidence. For a state ground to be "adequate," it must be "['f]irmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." Murden v. Artuz, 497 F.3d 178, 192 (2d Cir. 2007) (quoting Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)). The New York Court of Appeals has held that the contemporaneous objection rule is applicable to a claim that a trial court denied a defendant's right to present witnesses in his own defense, see People v. Angelo,

88 N.Y.2d 217, 222 (1996), and has regularly applied the rule to similar claims, see e.g., People v. Harris, 115 A.D.3d 763, 764 (2d Dep't 2014) ("[D]efendant's claim that the trial court violated his constitutional right to present a defense by precluding him from calling a particular witness at trial is unpreserved for appellate review . . . ." (citation omitted)); People v. Hurst, 113 A.D.3d 1119, 1120 (4th Dep't 2014) (defendant failed to preserve claim that he was denied right to present evidence); People v. McMath, 54 A.D.3d 566, 568 (1st Dep't 2008) ("As to the attendance of witnesses, since defendant never protested that the court's failure to compel their attendance at trial violated his constitutional right to present a defense, the issue is unpreserved for review . . . ."). The Appellate Division properly applied the rule to Fox's claim because Fox's counsel made no objection to Fortunato's testifying in the absence of Fox's jury. Fox's claim is therefore procedurally defaulted and the petition is denied for that reason alone.[9]

## B. Merits

Fox's right-to-present-evidence claim is procedurally barred, but even if it were not, it would be denied as without merit. Fox was not denied the right to present Fortunato's testimony to his jury; he simply failed to avail himself of the opportunity to do so. As discussed above, Fox's and Fortunato's trials were conducted by means of a dual-jury procedure, in large part to solve the Bruton problem with respect to Fox's statements. The parties were well aware that neither Fox nor his jury would be present during the presentation of Fortunato's case, and Fox neither opposed his nor his jury's removal from the courtroom during the presentation of Fortunato's case. He also failed to accept the trial court's invitation to let the court know if he "strategically . . . decide[d]"

---

[9] Although Fox could obtain federal habeas review of his procedurally defaulted claim by showing either "cause for the default and prejudice" or that "failure to consider the claims will result in a miscarriage of justice (i.e., the petitioner is actually innocent)," he argues neither. Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001) (citing Coleman, 501 U.S. at 748–50). Indeed, Fox does not dispute his involvement in the death of Sandy, despite his assertions that the killing and the attempted robbery hate crimes were not committed with the requisite intent (due to intoxication and lack of animus). See Bousley v. United States, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.").

he wanted his jury to hear evidence that it would otherwise be dismissed for. (Tr. 1461-62.) Fox

further failed to call Fortunato as a witness to testify in front of his jury—or, in the event Fortunato

invoked his Fifth Amendment privilege, to have Fortunato's statements introduced to his jury as

the hearsay statements of an unavailable witness. (See Pet'r Reply at 19 (citing People v. Stultz,

2 N.Y.3d 277, 286 (2004)). In other words, the absence of Fox and his jury during the presentation

of Fortunato's case did not violate Fox's right to present evidence because Fox did have the

opportunity to present Fortunato's testimony to his jury; he simply failed to take advantage of that

opportunity. As with grounds one and two, Fox does not, and indeed cannot, point to any federal

case in which similar circumstances were held to constitute a denial of the defendant's right to

present evidence. The Appellate Division held that this claim was without merit, and for the above

reasons, its holding was neither contrary to nor an unreasonable application of federal law.

At most, Fox's arguments that his jury should have heard Fortunato's testimony are a

criticism of his defense counsel, who failed to recognize the alleged benefits of Fox's jury hearing

this testimony and arranging to have it so presented. Such arguments, however, sound in

ineffective assistance of counsel, not denial of the right to present evidence, and are discussed in

response to Fox's ineffective-assistance-of-counsel ground, infra.

Even assuming that Fox's jury's absence during Fortunato's testimony did violate his right

to present evidence, any such error was harmless. In the context of a federal habeas proceeding,

an error is harmless so long as it did not have a substantial and injurious effect or influence in

determining the jury's verdict. See, e.g., Fry v. Pliler, 551 U.S. 112, 121–22 (2007). In Fox's

case, the evidence of his guilt of the crimes of which he was convicted was overwhelming (see

State's Habeas Affidavit at ¶¶ 46–59, 61–78, 81–82). Fox argues that the different verdicts

rendered for himself versus for Fortunato shows that this was not a case of "overwhelming

evidence." (Pet'r Reply at 24.) But the difference in the verdicts for the two co-defendants is better explained not by the fact that Fortunato's jury heard Fortunato's testimony whereas Fox's jury did not, but rather by their very differing levels of involvement in the crimes against Sandy. Specifically, while there was no evidence that Fortunato used any force against Sandy, there was evidence that Fox used force against Sandy, and Fortunato's testimony only further corroborated their discrepant involvement in the events surrounding Sandy's death. (Tr. 1495–96.)

In sum, Fox's claim that he was denied the right to present evidence is procedurally defaulted and should therefore be denied on that ground alone. In any event, it is without merit because he was not in fact denied the right to present Fortunato's testimony to his jury. Finally, even if Fox was denied this right, the error was harmless.

## IV.    Ground Four: Right to the Effective Assistance of Counsel

Fox argues that he was denied effective assistance of counsel because his trial counsel, John Patten, failed to: (1) object to the absence of Fox and Fox's jury during Fortunato's testimony; (2) remain in the courtroom himself, during Fortunato's testimony; and (3) object to the trial court's charge to the jury on intoxication. The Supreme Court, Kings County denied Fox's ineffective assistance of counsel claim on the merits. (State's Ex. K (Decision and Order dated September 8, 2010, Supreme Court of the State of New York) at 5 ("Although the defendant's ineffective assistance of counsel claims are mandatorily barred, they are also wholly without merit.").) Fox then presented this claim to the Appellate Division, which also concluded that Fox was not deprived of the effective assistance of counsel. Specifically, the court held:

> Contrary to the defendant's contention, he was not deprived of the effective assistance of counsel under the United States Constitution (see Strickland v. Washington, 466 US 668, 688 (1984)). Moreover, the defendant was not deprived of the effective assistance of counsel under the New York Constitution since, viewing defense counsel's performance in totality, counsel provided meaningful representation (see People v. Benevento, 91 N.Y.2d 708, 712 (1998); People v. Baldi, 54 NY2d 137, 147 (1981)).

19

Fox, 998 N.Y.S.2d at 440. Because the state courts ruled on the merits of Fox's claim, the claim is subject to the "highly deferential" standard of review set forth in 28 U.S.C. § 2254(d). See Renico v. Lett, 559 U.S. 766, 773 (2010) (citation omitted). Because the state courts' adjudication of this ground for relief did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), and did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" id. § 2254(d)(2), Fox is not entitled to habeas relief on this ground.

Under the Federal Constitution, a defendant is merely entitled to "reasonably effective assistance," which, when viewed "in light of all the circumstances," does not fall "outside the wide range of professionally competent assistance." Strickland, 466 U.S. 668, 687, 690 (1984). "To succeed on a claim that he has been denied constitutionally effective assistance of counsel, the defendant must show both (a) 'that counsel's representation fell below an objective standard of reasonableness' and (b) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" United States v. DiTomasso, 932 F.3d 58, 69 (2d Cir. 2019) (quoting Strickland, 466 U.S. at 688). A claim of ineffective assistance of counsel "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Harrington, 562 U.S. at 110 (citation omitted). When reviewing a claim of ineffective assistance of counsel on habeas review, this Court must apply the standard set forth in Strickland together with the standard set forth in 28 U.S.C. § 2254(d) and, consequently, must be "'doubly' deferential" to the State court's determination of that claim. Rivas v. Fischer, 780 F.3d 529, 547 (2d Cir. 2015) (quoting Harrington, 562 U.S. at 105). Therefore, on habeas review of a claim of ineffective assistance of counsel, the relevant question

"is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. Here, Fox has "fail[ed] to rebut the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' deemed acceptable under our 'highly deferential' standard of review." United States v. Kaplan, 758 F. App'x 34, 41 (2d Cir. 2018) (quoting Strickland, 466 U.S. at 689).

First, Patten's decision not to object to Fox's jury's absence during Fortunato's testimony was not unreasonable in light of all of the circumstances. Patten's decision not to object could be regarded as reasonable, given that Fortunato's testimony had the potential to be more damaging to Fox's case than it would be beneficial. The reasonableness of this decision is underscored by the damaging testimony Fortunato in fact provided, including testifying that (1) Fox and Shurov chased Sandy as Sandy fled to the parking lot, (Tr. 1621–22); (2) then there was a "scuffle" (Tr. 1622–23); and (3) although neither Fortunato nor Timmins was "involved in what happened" to Sandy, Fox was "involved with respect to what happened to" Sandy, (Tr. 1637.) Here, Fox's counsel's decision not to allow Fox's jury to hear Fortunato's testimony thus does not support an ineffective assistance of counsel claim. See United States v. DiTomasso, 932 F.3d 58, 69–70 (2d Cir. 2019) ("Trial counsel's '[a]ctions or omissions . . . that might be considered sound trial strategy,' including decisions not to 'call specific witnesses—even ones that might offer exculpatory evidence—[are] ordinarily not viewed as a lapse in professional representation.'") (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000), cert. denied, 532 U.S. 1007 (2001)). Moreover, Fox's argument that Patten's decision not to object was not in fact a tactical one but rather based on an erroneous belief that Bruton applied is misplaced. (Pet'r Reply at 22–24.) The subjective reasoning and beliefs motivating Fox's counsel are not relevant to his

21

ineffective assistance of counsel claim, which instead "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Harrington, 562 U.S. at 110 (citation omitted). In short, Fox's counsel's decision not to object to his jury's absence during Fortunato's testimony falls within the "'wide range of reasonable professional assistance' deemed acceptable under our 'highly deferential' standard of review." Kaplan, 758 F. App'x at 41 (quoting Strickland, 466 U.S. at 689).

Fox also contends that he was denied effective assistance of counsel because Patten himself failed to remain in the courtroom during Fortunato's testimony. This contention is effectively a "failure to investigate" argument, see, e.g. United States v. Caracappa, 614 F.3d 30, 46–48 (2d Cir. 2010), as Fox argues that Patten's failure to remain in the courtroom or read the transcript of Fortunato's testimony prevented him from learning about and making use of Fortunato's purportedly favorable testimony. But Fox's argument in this regard is belied by his own briefing, in which he states that "prior to Fortunato's testimony, [Patten] knew its content" and also that Patten "knew the substance of what Fortunato's [testimony] would be." (Pet'r Reply at 23, 25.) By Fox's own admission, therefore, Patten's decision not to remain in the courtroom during Fortunato's testimony was not a failure to investigate a potentially favorable witness, but rather a reasonable decision not to further investigate a witness whom he already had good reason to believe would not serve his client's defense. See Rompilla v. Beard, 545 U.S. 374, 383 (2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Even if Fox's counsel's failure to observe or read a transcript of Fortunato's testimony did constitute ineffective assistance of counsel, any such error was harmless, for the same reasons discussed in section III, supra.

22

Third, Fox contends that he was denied effective assistance of counsel because Patten failed to object to the trial court's charge to the jury on intoxication. More specifically, Fox argues that Patten erred by failing to object when the trial court, after charging intoxication with respect to the first two counts alleging intentional conduct, did not do so for the latter counts alleging intentional conduct. However, because the jury charge, as a whole, adequately instructed the jury on intoxication, it was not unreasonable for Patten not to object to the trial court's failure to specifically charge intoxication on the latter counts. As the Appellate Division explained, "[a]lthough the [trial] court did not provide the same [intoxication] instruction again [with respect to the latter counts], . . . the court related the effect of intoxication to the specific element of intent in connection with the first and second counts, instructed that the jury could consider evidence of intoxication whenever relevant to negate an element of 'a crime charged,' and provided a specific definition of the required intent with regard to the counts on which the defendant was convicted." Fox, 998 N.Y.S.2d at 440. Accordingly, the jury charge, "when reviewed in its entirety, adequately instructed the jury on intoxication." Id. Because the charge was adequate overall, Patten's failure to object to portions of it falls within the "'wide range of reasonable professional assistance' deemed acceptable under our 'highly deferential' standard of review." Kaplan, 758 F. App'x at 41 (quoting Strickland, 466 U.S. at 689). Moreover, for the reasons discussed above, Fox's argument that Patten's decision not to object was not in fact a reasoned decision but rather due to a lack of attention is misplaced. (Pet'r Reply at 26–27.) As aforementioned, the subjective reasoning and beliefs motivating Fox's counsel are not relevant to his ineffective assistance of counsel claim, which instead "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Harrington, 562 U.S. at 110 (citation omitted).

In any event, even if Patten should have objected, Fox has failed to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." DiTomasso, 932 F.3d at 69 (internal quotation marks and citation omitted). Fox points to the fact that he was convicted only for those crimes on which the jury was not explicitly charged on intoxication as evidence that Patten's failure to object was "critical" in his case. (Pet'r Reply at 25–26.) But this argument fails. The jury heard very general evidence that Fox had consumed beer, but no evidence was presented about the precise amount of beer he consumed, the period of time during which it was consumed, whether it had been consumed on an empty stomach, or the specific impact the alleged consumption may have had on Fox's behavior or mental state. See People v. Gaines, 83 N.Y.2d 925, 927 (1994). Based on a review of the trial record as a whole, the much more likely explanation that Fox was not convicted of the two most serious charges—murder in the second degree as a hate crime and murder in the second degree—is not that the jury believed that intoxication negated his intent with respect to those two charges, but rather that the prosecution did not meet its burden of proof on these charges. Finally, as aforementioned, Patten's failure to object was unlikely to have impacted the result of the proceeding because the charge as a whole was adequate. For all of these reasons, Patten's failure to object to the jury charge on intoxication did not render his assistance ineffective.

Because this Court finds that Patten committed no error, Fox's argument that "cumulative error by [his trial] counsel . . . constitute[d] ineffective assistance" also fails. (Pet'r Reply at 29.) In sum, Fox's claim of ineffective assistance of counsel does not warrant habeas relief.

## V.      Ground Five: Statements to Police Were the Product of Custodial Interrogation in the Absence of Probable Cause

Fox claims that he is entitled to habeas relief because his statements to detectives at the 61st Precinct were the product of an unlawful seizure, and he did not receive a full and fair hearing

24

in state court on the suppression of these statements. Specifically, Fox contends that (1) he had been seized and was in custody when the detectives first started questioning him at the 61st Precinct, but the detectives lacked probable cause to arrest him and failed to administer <u>Miranda</u> warnings until hours after the interrogation began; and (2) he did not receive a full and fair suppression hearing because the prosecution did not call Detective D'Angelo, a material witness, to testify. Because Fox was provided with an opportunity for a "full and fair litigation of [his] Fourth Amendment claim," this claim is barred from federal habeas review. <u>Stone v. Powell</u>, 428 U.S. 465, 494–95 (1976).

"[W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." <u>Id.</u>, 428 U.S. at 494–95. Federal habeas review is permitted only "where the state provided no corrective procedures at all, or there had been an 'unconscionable breakdown' in state process which prevented utilization of an existing procedural remedy." <u>McPhail v. Warden, Attica Correctional Facility</u>, 707 F.2d 67, 70 (2d Cir. 1983) (quoting <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977)). In this case, the state court conducted a hearing to address Fox's motion to suppress his statements, based upon his Fourth Amendment claim that there was no probable cause for his arrest. (<u>See</u> Resp. Aff. at ¶¶ 6–43; D.E # 8-1; D.E. # 8-2).[10] During the hearing, Detectives Byrne, Cennamo, and Dellecave testified, and Fox was able to cross-examine the State's witnesses and to present his own case. (<u>Id.</u>)

---

[10] The transcript from Fox's pre-trial suppression hearing is contained in Respondent's Ex. A, which is found in D.E. # 8-1 and D.E. # 8-2. D.E. # 8-2 also contains multiple other exhibits. Pagination is therefore based on the PDF page number, not the page number of each individual exhibit within the docket entry.

Fox contends that he was not given a full and fair hearing because the prosecution was required under New York law to present "police officers who possess 'material evidence' on the circumstances of the interrogation." (Pet'r Reply at 31 (citations omitted).) Fox argues that D'Angelo was a material witness because he was one of the officers who entered Fox's dormitory room, was next to Fox during the car ride to the Precinct, participated in the interrogation of Fox at the Precinct, and signed the Miranda warnings sheet to which Fox maintains that a false time was inserted after the interrogation commenced. (Id.) But the State was not required to produce Detective D'Angelo, and none of the cases Fox cites support his proposition to the contrary. Rather, the cases Fox cites support the notion that the State would not meet its burden of proving that a defendant's statements were voluntary if it failed to call a witness to rebut the defendant's uncontradicted testimony, see People v. Wheeler, 32 A.D.3d 1107, 1108 (3d Dep't 2006), or if it failed to call the sole officer present when the defendant confessed, and whom the defendant alleged physically and mentally abused him, see People v. Valerius, 286 N.E.2d 254 (N.Y. 1972). The State also would not meet its burden if it put only one police officer on the stand who merely "testified in conclusory fashion" about the key facts regarding the voluntariness of the defendant's statements. People v. Goodman, 430 N.E.2d 1255, 1257 (N.Y. 1981). But these are far from the circumstances present here.

Rather, here, the State called three detectives to the stand—Detectives Cennamo, Byrne, and Dellecave. None of Fox's contentions were uncontradicted, and Detective D'Angelo did not possess any information that the other detectives could not themselves testify to. Moreover, in a written opinion following the hearing, the court credited the testimony of the detectives. (D.E. # 8-2 at 287). In short, Fox has not persuaded this Court that Detective D'Angelo was required to testify in order for Fox to receive a full and fair litigation of his Fourth Amendment claim. See

People v. Witherspoon, 489 N.E.2d 758, 759 (N.Y. 1985) (citation omitted) ("When a defendant properly challenges statements made by him that the People intend to offer at trial, it is, of course, the People's burden to establish, beyond a reasonable doubt, that such statements were voluntarily made. This does not mean, however, that the People are mandated to produce all police officers who had contact with the defendant from arrest to the time that the challenged statements were elicited." (citation omitted)).

Finally, it is worth noting that not only did Fox receive the opportunity to litigate his Fourth Amendment claim at the pretrial suppression hearing described above, but he also received a second hearing after successfully moving to reopen the hearing on the Dunaway aspect of his motion to suppress. See People v. Fox, 2007 N.Y. Misc. LEXIS 9368 (Sup. Ct. Kings Cty. Sept. 12, 2007). The court adhered to its previous order denying his motion to suppress. Id. Fox then asserted his Fourth Amendment claims on his direct state appeal, and the Appellate Division rejected these claims on the merits. In sum, Fox was given a full and fair opportunity in the State courts to litigate his Fourth Amendment claims, and his application on this ground must therefore be denied. Powell, 428 U.S. at 494–95; see also Diggs v. Artus, 2013 U.S. Dist. LEXIS 31054, at *37 (E.D.N.Y. Mar. 5, 2013).

## VI. Ground Six: Prosecution Did Not Establish Voluntariness of Statements Beyond a Reasonable Doubt

As his sixth ground for relief, Fox claims that the State failed to establish beyond a reasonable doubt that his statements to law enforcement were voluntary because (1) Fox testified at the pretrial suppression hearing, in contradiction to the testimony of Detectives Byrne and Cennamo, that no Miranda warnings were given and that the detectives were "intimidating and yelling at him for a long period of time" before he made any incriminating statements; and (2) the

27

State failed to have Detective D'Angelo testify at the hearing. (Pet. at 14.) This claim also does not warrant habeas relief.

Fox presented this claim both to the hearing court and to the Appellate Division, and both courts adjudicated the claim on the merits. Because the state courts ruled on the merits of this claim, it is subject to the "highly deferential" standard of review set forth in 28 U.S.C. § 2254(d). See Lett, 559 U.S. at 773 (2010) (citation omitted). And because the state courts' adjudication of the claim did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," see 28 U.S.C. § 2254(d)(1), nor did it "result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," see 28 U.S.C. § 2254(d)(2), Fox is not entitled to habeas relief.

The hearing court's holding that Fox's statements were voluntarily made was largely based on an assessment of Fox's credibility and the credibility of the two detectives—Detectives Byrne and Cennamo—who testified for the State with respect to Fox's interrogation. The hearing court credited the testimony of Detectives Byrne and Cennamo, and did not credit most of Fox's testimony, finding it both "inconsistent and incredible." (D.E. # 8-2 at 287). On habeas review, a state court's factual determinations are presumed to be correct, 28 U.S.C. § 2254(e)(1), and "[t]his presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility," Shabazz v. Artuz, 336 F.3d 154, 161 (2d Cir. 2003) (citations omitted); see also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding . . . ." (citations omitted)). Particularly given the numerous inconsistencies in Fox's testimony, it was

not objectively unreasonable for the hearing court to discredit his testimony, and there is nothing in the record to indicate that it would have been objectively unreasonable for the court to credit the detectives' testimony.

As for Fox's contention that in order to prove the voluntariness of his statements beyond a reasonable doubt, the State was required to call Detective D'Angelo, that argument is without merit. The Supreme Court has not held that, if a defendant testifies at a pretrial suppression hearing regarding the voluntariness of his statements, then the State has to introduce, at the hearing, testimony from all of the police witnesses to the defendant's interrogation. Moreover, Detectives Byrne and Cennamo had personal knowledge of the circumstances surrounding Fox's statements, and there was no evidence presented at the hearing suggesting that there were matters relevant to determining the voluntariness of Fox's statements of which Detective D'Angelo had knowledge, but of which both Byrne and Cennamo were ignorant. In sum, Fox's claim that the State failed to meet its burden of proof with respect to establishing the voluntariness of his statements does not warrant habeas relief.

### VII. Ground Seven: Commission of a "Hate Crime," as Defined by New York Law, Was Not Established Beyond a Reasonable Doubt

Fox contends that the evidence at trial did not establish his guilt beyond a reasonable doubt of committing crimes under New York's Hate Crime Act, New York Penal Law § 485.05(a)(1), because there was no evidence that he or his co-defendants were "motivated by any prejudice or hatred towards gay people," (Pet. at 15), which Fox further contends is an element of said statute, (Pet'r Reply at 5–15). Accordingly, Fox argues that his conviction of hate crimes violates both the Supreme Court's "no evidence rule" and the rule that a criminal defendant's guilt must be established beyond a reasonable doubt. (Id. at 5 (citing Jackson v. Virginia, 443 U.S. 307, 313–16 (1979).) The State concedes that "there was no evidence presented at trial that [Fox], or his

29

codefendants, were motivated to commit their crimes because of any animus regarding gay people." (Resp. Opp'n at 74.) But the State argues that no such evidence was required to establish Fox's guilt under this statute because animus, prejudice, or hatred is not an element of the crime.

The parties make a number of arguments in support of their respective interpretations of New York's hate crime statute. This question, however, is fundamentally one of state law. Accordingly, this Court is bound by the Appellate Division's interpretation of the statute. The Supreme Court has held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991). Rather, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68 (citations omitted). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) (citations omitted); see Portalatin v. Graham, 624 F.3d 69, 84 (2d Cir. 2010) (en banc) ("[W]e do not defer to [the New York Court of Appeals'] interpretation of federal law, but we are bound by its construction of New York law in conducting our analysis . . . ." (emphasis in original)). "[A] habeas court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law." Baptiste v. Ercole, 766 F. Supp. 2d 339, 353 (N.D.N.Y. 2011) (citation omitted); see Bradshaw, 546 U.S. at 78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous."). "A determination of state law by a state intermediate appellate court is also binding in a federal habeas action, especially where, as in this case, the Court of Appeals has denied review of the Appellate Division's decision." Baptiste, 766 F. Supp. 2d at 353 (citing Hicks v. Feiock, 485 U.S. 624, 629–30 & n.3 (1988) ("We are not at liberty to depart

from the state appellate court's resolution of these issues of state law. Although petitioner marshals a number of sources in support of the contention that the state appellate court misapplied state law on these two points, the California Supreme Court denied review of this case, and we are not free in this situation to overturn the state court's conclusions of state law.")).

Here, on Fox's direct appeal, the State conceded that there was no evidence presented at trial showing that Fox or his co-defendants were motivated by animus, but the State argued that evidence of animus was not required because "the Penal Law definition of a hate crime (N.Y. Penal Law § 485.05(1)) does not contain any language suggesting that to be guilty of a hate crime, a person has to be motivated by bias, prejudice, or hatred." (D.E. # 8-9 at 112.)[11] Rather, the State argued, New York's hate crime statute merely requires that the prosecution prove beyond a reasonable doubt that the defendant "intentionally select[ed] the person against whom the offense is committed or intended to be committed in whole or in substantial part because of a belief or perception regarding . . . [the] sexual orientation of [the] person," or some other protected characteristic of that person. (Id. at 112 & n.39 (citing New York Penal Law § 485.05(a)(1) (2000) (internal quotation marks omitted)).) Accordingly, Respondent argues, in Fox's case, the State had to establish only that Fox targeted Sandy as a victim "in whole or in substantial part because of a belief that Sandy was a gay man." (Id. at 112.)

By holding that the evidence adduced at trial—which concededly did not include any evidence that Fox was motivated by animus or prejudice—was nonetheless "legally sufficient to establish [Fox's] guilt of the three hate crimes of which he was convicted beyond a reasonable doubt," Fox, 998 N.Y.S.2d at 440, the Appellate Division implicitly but necessarily accepted the State's argument that New York Penal Law § 485.05(l)(a) does not include animus, prejudice, or

---

[11] D.E. # 11 includes Respondent's exhibits G through P. Pagination is based on the PDF page number, not the page number of each individual exhibit within the docket entry.

hatred as an element of the crime. And the Court of Appeals has denied review of the Appellate Division's decision. For purposes of reviewing the legal sufficiency of the trial evidence on habeas review, this Court is bound by the Appellate Division's implicit but inescapable conclusion that in order to prove Fox's guilt of the hate crimes beyond a reasonable doubt, the State did <u>not</u> have to establish that Fox, or his co-defendants, was motivated by animus toward gay people. <u>See</u> <u>Baptiste</u>, 766 F. Supp. 2d at 353; <u>see also</u> <u>Bradshaw</u>, 546 U.S. at 76 (2005); <u>Hicks</u>, 485 U.S. at 629–30 & n.3. Moreover, "look[ing] through" the Appellate Division's "unexplained decision" to the prior decisions in the case, as Fox urges this Court to do, leads to the same result. (Pet'r Reply at 11 (citing <u>Wilson v. Sellers</u>, 138 S. Ct. 1188 (2018).) Here, the prior decision in the case was the New York Supreme Court's denial of Fox's similar pretrial motion and holding that New York Penal Law § 485.05(a)(1) did "not require proof of anything other than the intentional selection of a victim" "because of a particular attribute." <u>Fox</u>, 844 N.Y.S.2d at 627. Consequently, this Court rejects Fox's claim that because there was no trial evidence that Fox, or his co-defendants, "were motivated by any prejudice or hatred towards gay people," the State did not establish beyond a reasonable doubt Fox's guilt of the hate crimes of which he was convicted. Accordingly, Fox's insufficiency claim does not warrant habeas relief.

## VIII. Ground Eight: Denial of a Fair Trial Due to Cumulative Effect of Constitutional Error

Because none of Fox's individual claims of purported constitutional error was found to have merit, Fox's claim that the cumulative effect of constitutional error denied him a fair trial also does not warrant habeas relief.

## CONCLUSION

For the reasons set forth above, Fox's petition is dismissed. Because Fox has failed to make a "substantial showing of the denial of a constitutional right," a Certificate of Appealability shall not issue. 28 U.S.C. § 2253(c). The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.


SO ORDERED.

Dated: September 30 , 2019
      Brooklyn, New York

                                   s/Carol Bagley Amon
                                   Carol Bagley Amon
                                   United States District Judge